UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| KENT BERRY JAIMES RAMIREZ<br><br>**Plaintiff**<br><br>vs.<br><br>Rafael Ricardo Jimenez Dan, Dayva Soto and their conjugal partnership; Corporations A, B & C; William Doe and Mary Doe<br><br>**Defendants** | Civil Case Number: _____ (____)<br><br>Breach of Contract, Damages and Unjust Enrichment<br><br>Jury Trial is Demanded. |

**COMPLAINT**

**TO THE HONORABLE COURT**:

**COMES NOW** the Plaintiff, Kent Berry Jaimes Ramirez, through the undersigned attorneys, and very respectfully states, alleges and prays as follows:

### I.   INTRODUCTION

This is a civil action in which the Plaintiff, Kent Berry Jaimes Ramirez, claims damages for breach of contract, unjust enrichment, and tort from defendants, Rafael Ricardo Jimenez Dan, Dayva Soto, and their conjugal partnership for their non-performance of obligations and material breach of a contract between the parties, the tort related to that breach, and unjust enrichment.

### II.   JURISDICTION AND VENUE

**1.**   *Jurisdiction*: This Honorable Court has jurisdiction over the present action pursuant to 28 U.S.C. 1332 over state law claims under sections of the Puerto Rico Civil Code and other applicable statutes, and equity. Total diversity of citizenship exists between plaintiffs and defendants as they are citizens of different states, and the amount in controversy exceeds the sum of $75,000.00, exclusive interests and costs.

2. *Venue*: Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and/or omissions giving rise to this claim occurred in this district.

### III. THE PARTIES

3. Plaintiff, **Kent Berry Jaimes Ramirez** ("Mr. Jaimes Ramirez"), is, of legal age, single, a songwriter, music producer, manager, musical artist, content creator in the urban latin music genre and resident of San Juan, Puerto Rico.

4. Defendant, **Rafael Ricardo Jimenez Dan,** ("Mr. Jimenez Dan) is upon knowledge and belief, of legal age, legally married, a businessman, a citizen of the Republic of Venezuela and resident of Miami, Florida. Mr. Jimenez is included herein in his personal capacity and as representative of the conjugal partnership established with his wife, Dayva Soto.

5. Defendant, **Dayva Soto** is Mr. Jimenez Dan's wife.

6. The conjugal partnership, **Jimenez-Soto** is liable for the conduct set forth herein.

7. Co-Defendants, **Companies A, B & C**, are corporations that may be responsible to Plaintiff for the facts alleged in the present Complaint, but at this moment their names and addresses are unknown.

8. Co-Defendants, **Insurance Companies X, Y & Z**, are insurance companies that may be responsible to the Plaintiff for the facts alleged in the present Complaint, but at this moment their names and addresses are unknown.

9. Co-Defendants, **William Doe** and **Mary Doe**, are unknown individuals who are or might be responsible to the Plaintiff for the facts alleged in the present Verified Complaint, but at this moment their names and addresses are unknown.

## IV. FACTS

**10.** Mr. Jaimes Ramirez was born in Caracas, Venezuela in 1981 and has been legally residing in San Juan Puerto since 2018.

**11.** Plaintiff, Kent Berry Jaimes Ramirez ("Mr. Jaimes Ramirez"), is of legal age, single, a songwriter, music producer, artist, manager, and content creator in the urban latin music genre.

**12.** Mr. Jaimes Ramirez since an early age, while still living in Venezuela, demonstrated an interest in the music industry which led him to be member of an upstart rock band.

**13.** Mr. Jaimes Ramirez founded a band named *"Los Cadillacs"* and was a member of the musical duo professionally known as *"Kent & Tony"*.

**14.** On or about 2011, Mr. Jaimes Ramirez, hired as his manager, Zaphyro Artiles, a well-known personality and model in Venezuela, to help him in the furtherance of his singing career while he was still a member of *"Kent & Tony"*, and to seek an investor, who would be interested in financially contributing to his artistic career and other projects in the entertainment industry.

**15.** Ms. Artiles, on or about 2011-2012, introduced Mr. Jaimes Ramirez to a friend of hers, defendant, Rafael Ricardo Jimenez Dan at a restaurant in Caracas, Venezuela known as *"El Alazan"*, since Mr. Jimenez was interested in potentially investing in Mr. Jaimes' artistic career and the other projects in the entertainment industry.

**16.** While at Mr. Jimenez Dan's office in Caracas Venezuela, Mr. Jaimes Ramirez brought to the attention of defendant, Mr. Jimenez Dan, the idea of creating an entity that would bring together urban latin musical artists from Puerto Rico and Venezuela together as these groups of artists had created strong and meaningful bonds over the years ("the project or project").

3

**17.** Defendant, Mr. Jimenez Dan really liked the idea and told Ms. Artiles to come over to his office with Mr. Jaimes Ramirez to further discuss investing in the development of the *"Kent & Tony"* duo and the project.

**18.** In the following days, Ms. Artiles and plaintiff Mr. Jaimes Ramirez visited defendant, Mr. Jimenez Dan at his office located at the Sabana Grande sector of Caracas, Venezuela and were immediately impressed by its organization and the amounts of attorneys, accountants, secretaries, assistants, security guards, chauffers, etc., who worked for defendant, Mr. Jimenez Dan and his companies.

**19.** Thinking that these amounts of resources and organization would be excellent for the development of the *"Kent & Tony"* duo and the prospective project, plaintiff, Mr. Jaimes Ramirez further discussed their details and viability with defendant, Mr. Jimenez Dan, and they agreed to become partners.

**20.** While discussing details, Defendant, Mr. Jimenez Dan told plaintiff, Mr. Jaimes Ramirez that he did not own any entities that conducted business in the entertainment industry and as agreed he would be willing to create one and pay all set up expenses while plaintiff, Mr. Jaimes Ramirez would contribute his time, talents as an artist/musicians, contacts, and experience in the music industry.

**21.** In accord with the agreement, Mr. Jimenez Dan created an entity called *"KYT Productions"*, to go about the business of developing the *"Kent & Tony"* duo and start giving shape to the project in Venezuela.

**22.** After Mr. Jimenez Dan commenced with to work with plaintiff, Mr. Jaimes Ramirez on the *"Kent & Tony"* duo and to develop the project, Ms. Artiles abandoned her work on the project due to disputes and differences with Tony Gonzalez (the other member of *"Kent & Tony"*).

23. On about the same time, plaintiff, Mr. Jaimes Ramirez' U.S. travel visa expired and during its renewal process, since he was unable to travel to perform shows with the *"Kent & Tony"* duo, he began to perform administrative duties at "*KYT Productions*" such as making administrative decisions on "*KYT Productions*" and working on coordinating the production of *"Kent & Tony"* first studio album.

24. Then with Mr. Jimenez Dan's consent to cover production costs, plaintiff Mr. Jaimes Ramirez convinced renowned urban Latin music producers *"Musicólogo"* and *"Menes"* travel to Venezuela to begin work and produce *Kent & Tony's* first studio album.

25. During the production of the *"Kent & Tony"* first studio album which was to be titled "HD", plaintiff, Mr. Jaimes Ramirez created a strong relationship with Noah Assad ("Mr. Assad"), *Musicólogo* and *"Menes'* manager who traveled to Caracas, Venezuela to accompany his producers during the production stage of the "HD" album.

26. While in Venezuela, plaintiff, Mr. Jaimes Ramirez introduced Mr. Assad to defendant, Mr. Jimenez Dan and the three created a positive relationship. All three discussed the creative process of the *"Kent & Tony"* album "HD; talked about the music industry in general; and about the project of creating an entity that would internationally commercialize musical talents from Venezuela and Puerto Rico.

27. On or about 2011-2012, after Mr. Jaimes Ramirez renewed his U.S. travel visa, and visited Puerto Rico to continue to work on the *"Kent & Tony"* album "HD", during which his relationship with and Mr. Assad developed positively.

28. That relationship improved to the point that Mr. Assad, while a conversation in a parking lot in Old San Juan, Puerto Rico asked plaintiff, Mr. Jaimes Ramirez if he could become *Kent & Tony's* personal manager, to which, plaintiff, Mr. Jaimes Ramirez agreed.

29. When Mr. Jaimes Ramirez returned to Venezuela, on or about 2011-2012, he discussed with his investor and partner, defendant, Mr. Jimenez Dan, about the Mr. Assad being

5

*Kent & Tony's* duo manager and how, due to his relationships/contacts in the Puerto Rico music scene, Mr. Assad could be part, as a partner, of the project of the creating an entity that would internationally commercialize musical talents from Venezuela and Puerto Rico.

30. Defendant, Mr. Jimenez Dan, agreed to the idea of Mr. Assad becoming a part of the project and how he would help him and plaintiff, Mr. Jaimes Ramirez to know more of the Puerto Rico music scene.

31. Plaintiff, Mr. Jaimes Ramirez continued with his business relationship with Mr. Assad and kept defendant, Mr. Jimenez Dan, up to date on all the new contacts he had made and how he would break thru the Puerto Rico urban music scene movement which would in turn help them be more successful in their project relating to Venezuelan and Puerto Rican artists.

32. Plaintiff, Mr. Jaimes Ramirez told Mr. Jimenez Dan that for this project of Venezuelan and Puerto Rican talents to be successful they would have to create an entity outside of Venezuela, preferably the United States and a recording studio in Puerto Rico.

33. Mr. Jimenez Dan informed him that he would form an entity in Florida and would name it "RIMAS Entertainment" (RIMAS Entertainment), which are with the initials of his children, and as such this entity could be used for such a purpose.

34. Excited about the progress, Mr. Jaimes Ramirez and Mr. Jimenez Dan verbally agreed that for his services, Mr. Jaimes Ramirez would receive ten percent (10%) of any and all monies, royalties, and benefits derived from the profits, income and/or ownership share to RIMAS Entertainment, and other corporations and/or business vehicles used for business in the entertainment industry for this purpose of the project.

35. Mr. Jaimes Ramirez asked to execute paperwork to attest to this issue and Mr. Jimenez Dan told him not to worry that they would execute paperwork as to this issue on a later date, and not to worry that his agreed to percentage was secured.

6

36. Despite Jimenez Dan's promise to get the paperwork ready, the paperwork of the corporation was never produced by Mr. Jimenez Dan.

37. Subsequently, Plaintiff, Mr. Jaimes Ramirez and Mr. Assad, now having an entity that could sign talents, went about to seek scout artists, producers and songwriters that could be part of the RIMAS Entertainment project, authorize their signature to the company and their recording budgets.

38. In addition to his duties at RIMAS Entertainment of scouting talent, authorizing their signature to the company and establishing recording budgets, Plaintiff, Mr. Jaimes Ramirez also continued to perform as an artist and songwriter for the "*Kent & Tony*" duo, as he toured and performed at multiple venues, while managed by Mr. Assad, hereby contributing to the recoupment of monies invested by defendant, Jimenez Dan on the "*Kent & Tony*" duo.

39. During a meeting on or about, 2013 between Mr. Jimenez Dan, Noah Assad and Mr. Jaimes Ramirez, at Mr. Jimenez Dan's home located in the Weston community in Miami, Florida, it was verbally agreed that for his services (scouting talents, authorizing their signature, and setting up a business plan), Mr. Jaimes Ramirez, would receive ten percent (10%) of any and all monies, royalties, and benefits derived from the profits, income and/or ownership share to Rimas Entertainment, and other corporations and/or business vehicles used for business in the entertainment industry for this purpose, while Mr. Assad and Mr. Jimenez Dan would split the remaining ninety percent (90%).

40. Ultimately, Mr. Gonzalez paused his duties at the duo "*Kent & Tony*" and Plaintiff, Mr. Jaimes Ramirez, relying on his agreed to ten percent (10 %) ownership of Rimas Entertainment and related companies, dedicated more of his time and worked tirelessly with Mr. Jimenez Dan on administrative duties at RIMAS, and procured, evaluated and made decisions, with Mr. Assad, on which they could sign (commit) to become part of RIMAS Entertainment talent roster.

41. As a result of such reliance and security in the ownership of the company as agreed, Mr. Jaimes Ramirez evaluated and authorized the signature of artists of the likes of; *"Ozuna"*, *"Rayo y Toby"*, *"Corina Smith"* and was involved in the signature of artist *"Eladio Carrion"*.

42. Furthermore, Plaintiff, Mr. Jaimes Ramirez, alongside Mr. Assad, analyzed and ultimately authorized the signing of *"Jowel y Randy"* to RIMAS Entertainment.

43. Subsequently, on or about, 2013-2014 Plaintiff, Mr. Jaimes Ramirez and Defendant, Mr. Jimenez Dan met in Caracas, Venezuela and Mr. Jaimes Ramirez stressed the importance of establishing RIMAS Entertainment in San Juan, Puerto Rico and in opening a recording studio in Puerto Rico for Rimas Entertainment artists to record and produce content and take them to another next (higher) level, to which Mr. Jimenez Dan agreed, and asked Mr. Jaimes Ramirez to travel to Puerto Rico and search for a location for the recording studio.

44. Once again, during this visit to Venezuela on or about 2013-2014 Mr. Jaimes Ramirez and Mr. Jimenez Dan verbally agreed that Mr. Jimenez Dan would pay Mr. Jaimes Ramirez ten percent (10%) of any and all monies, royalties, and benefits derived from the profits, income and/or ownership share to Rimas Entertainment.

45. To that effect, Mr. Jaimes Ramirez asked for a document in writing that would reflect his agreement as to ownership, to which Mr. Jimenez Dan said that the verbal agreement would suffice but he would also execute in the future before an attorney to that effect.

46. As requested, and agreed to, on or about, 2013-2014 Mr. Jaimes Ramirez traveled to Puerto Rico and searched for RIMAS Entertainment, recording studio with Mr. Assad, with the help of Mr. Assad's mother, who as a licensed realtor in the territory would help them search for a property suitable to for that purpose.

47. Various property locations were visited while in Puerto Rico as possible studio sites, but ultimately one (1) bank repossessed property located in the *Ocean Park* neighborhood of San

8

Juan was selected by Mr. Jaimes Ramirez, who would be living there and property manager, for being close to the beach, which would be a good vibe for artists to record.

**48.** Then a company, named *Risamar Business Group, LLC*, was incorporated in Puerto Rico to purchase the house in in Ocean Park, and the property was purchased soon thereafter.

**49.** The property was ultimately purchased through an entity named "*Risamar*" or similar, with money invested by Mr. Jimenez Dan, and Mr. Jaimes Ramirez, as he moved in and managed the recording studio.

**50.** Once again, on or about 2014 while in *UVA* restaurant in Ocean Park neighborhood of San Juan, in Puerto Rico, Mr. Jaimes Ramirez and Mr. Jimenez Dan verbally agreed that for his services and contribution, Mr. Jaimes Ramirez would have a right to receive ten percent (10%) of any and all monies, royalties, and benefits derived from the profits, income and/or ownership share to Rimas Entertainment and all related companies that conducted business in the music industry.

**51.** Then on or about 2017, Ms. Astrid Albujas who was acting as manager of Mr. Jaimes Ramirez when he was performing under "*Kent*", and working with Mr. Jimenez Dan, was present at a meeting in the Weston neighborhood in Florida, with were once again, Jaimes Ramirez and Mr. Jimenez Dan verbally agreed that for his services and contributions, Mr. Jaimes Ramirez would receive ten percent (10%) of any and all monies, royalties, and benefits derived from the profits, income and/or ownership share to Rimas Entertainment and all related companies that conducted business in the music industry.

**52.** On multiple occasions thereafter, in Puerto Rico Defendant, Jimenez Dan thanked Mr. Jaimes Ramirez for his vision and for getting him out of politics and other businesses and introducing him to the music industry, furthermore he repeatedly agreed to pay Mr. Jaimes Ramirez a ten percent (10%) ownership to RIMAS Entertainment and all related companies that conducted business in the music industry once the company generated income.

53. As time went by, Mr. Jaimes Ramirez continued to work and contributed to the RIMAS Entertainment development and success on the reliance that he would receive his ten percent (10%) of the company assets and profits.

54. Eventually, in the span of those years, RIMAS Entertainment created a sister company to manage and acquire songwriter rights and administer composer catalogs, and went on to become one of the leading record labels in the latin market, as it signed to its roster of artists, multiple artists such *Aracangel, Mora, Eladio Carrion, Tommy Torres, Amenanzzy, Rafa Pabon,* among others, which include urban latin music super star *Benito Martinez p/k/a "Bad Bunny."*

55. The success of the RIMAS Entertainment and its penetration into the Latin market has made the company assets (master recordings, songs, properties, and rights) to be valued at an amount estimated well over $250 million dollars.

56. Mr. Jaimes Ramirez invested his time, talents, contacts, substantial contributions and continued hard work to the RIMAS Entertainment development and success on the reliance that he would receive his ten percent (10%) of the company assets and profits by virtue of his valid verbal agreement with defendant, Mr. Jimenez Dan.

57. While in Puerto Rico, Mr. Jaimes Ramirez, on multiple occasions asked Mr. Jimenez Dan for a document to further secure his ownership right to the ten percent (10%) of RIMAS Entertainment assets and profits, and Mr. Jimenez Dan, told him that of course he would get it and not to worry.

58. Mr. Jimenez Dan and Mr. Jaimes Ramirez personally agreed that for his work, Mr. Jaimes Ramirez, would receive his ten percent (10%) of RIMAS Entertainment assets and profits. Furthermore, Mr. Jimenez Dan stated to Mr. Jaimes Ramirez not to worry to his already agreed to ten percent (10%) of RIMAS Entertainment assets and profits for all his work because

he was very thankful and filled of gratitude for Mr. Jaimes Rodriguez having introduced him into this business and away from other business ventures.

59. The agreement was also very much evident as during visits to Puerto Rico, Mr. Jimenez Dan thanked Mr. Jaimes Ramirez publicly, before witnesses and on multiple occasions and stated that Mr. Jaimes Rodriguez would receive his ten percent (10%) of RIMAS Entertainment assets and profits for all his work and dedication to the project.

60. However, despite the aforementioned, Mr. Jimenez Dan sold his ownership share of RIMAS Entertainment to a third party, on or about 2023, and received, upon information and belief, substantial monies estimated to be in the millions of dollars without any compensation whatsoever to Mr. Jaimes Ramirez as he had agreed.

61. Ever since becoming partners in 2011, Mr. Jaimes Ramirez had a healthy relationship with Mr. Jimenez Dan and was in constant communication with him, but once M. Jimenez Dan received payment for his ownership share of RIMAS Entertainment, Mr. Jimenez Dan has cut all ties and communication with Mr. Jaimes Ramirez.

62. Mr. Jaimes Ramirez has tried to contact Mr. Jimenez Dan to collect his share of monies owed as agreed to, without any success.

63. Plaintiffs, Mr. Jaimes Ramirez, performed his part and relied on the verbal agreement, and defendant, Mr. Jimenez Dan and the conjugal partnership established with his wife, did not, as they did not pay the agreed to sums of ten percent (10%) of any and all monies, royalties, and benefits he received from the profits, income and sale of his ownership share to Rimas Entertainment, and other corporations and/or business vehicles used for business in the entertainment industry, in clear breach of the verbal agreement entered into while in Puerto Rico.

64. As a result of the aforementioned actions and material breach of contract and, and unjust enrichment by defendants, Mr. Jimenez Dan and the conjugal partnership established with his wife, Plaintiff, Mr. Jaimes Ramirez, suffered severe damages, in the form of loss of monies,

11

royalties, shares, profits, benefits, and loss of credibility in the industry, mental anguish and suffering and unjust enrichment which are which are estimated at an amount not less of one-hundred million dollars ($60,000,000).

## V. CAUSES OF ACTION

### A. Damages of Breach of Contract

50. All preceding paragraphs are hereby incorporated by reference.

51. Defendant's, **Rafael Ricardo Jimenez Dan and the conjugal partnership established with his wife Dayva Soto**, intentional, purposeful and negligent non-performance of the valid verbal contract with Plaintiff, Mr. Jaimes Ramirez constitutes a material breach of the agreement between the parties. By not performing its contractual obligations in the form of payment of an amount equal to ten percent (10%) of any and all monies, royalties, and benefits he received from the profits, income and sale of his ownership share to Rimas Entertainment, and other corporations and/or business vehicles used for business in the entertainment industry as agreed upon, defendant, **Rafael Ricardo Jimenez Dan and the conjugal partnership established with his wife Dayva Soto** materially breached the contract with **Kent Berry Jaimes Ramirez**.

52. As a direct and proximate result of defendant, **Rafael Ricardo Jimenez Dan and the conjugal partnership established with his wife Dayva Soto**, material breach, plaintiff, **Kent Berry Jaimes Ramirez** has suffered damages in the form of reasonable expenses and costs in reliance of defendant's performance of the contract, plus the loss of monies, royalties, shares, profits, benefits, and loss of credibility in the industry which are estimated at an amount not less than fifty million dollars (**$50,000,000.00).**

53. *Mental Anguish and Suffering:* Furthermore, as a direct and proximate result of defendant, **Rafael Ricardo Jimenez Dan Ricardo Rafael Jimenez Dan and the conjugal partnership established with his wife Dayva Soto** material breach, plaintiff, **Kent Berry**

12

**Jaimes Ramirez** has suffered damages in the form of severe anguish and mental suffering for having been humiliated and invested valuable time, monies, abandonment of artistic career, resources, credibility, access to relationships in the business industry and loss of business opportunities without any compensation as agreed which are estimated at an amount not less than ten million dollars (**$10,000,000.00).**

      **B.**    <u>**Unjust Enrichment**</u>

54. All preceding paragraphs are hereby incorporated by reference.

55. Defendant, **Rafael Ricardo Jimenez Dan and the conjugal partnership established with his wife Dayva Soto**, through their actions unjustly enriched themselves at plaintiff, **Kent Berry Jaimes Ramirez** expense, and as such should be required to make restitution of and/or for the benefits they received.

56. Furthermore, through and with knowledge of their actions Defendants, **Rafael Ricardo Jimenez Dan and the conjugal partnership established with his wife Dayva Soto** patrimony increased substantially while plaintiff's, **Kent Berry Jaimes Ramirez** decreased. Hence Plaintiff's, **Kent Berry Jaimes Ramirez**, requests an amount not less than forty million dollars (**$40,000,000)** for unjust enrichment.

## VI. <u>JURY DEMAND</u>

57. Plaintiff, **Kent Berry Jaimes Ramirez**, very respectfully requests a jury trial.

## VII. <u>PRAYER</u>

**WHEREFORE**, it is respectfully requested that this Honorable Court, for the above stated reasons, Plaintiff, **Kent Berry Jaimes Ramirez** asks for judgment against defendant's, **Rafael Jimenez Dan and the conjugal partnership established with his wife Dayva Soto** for the following:

13

a) A monetary amount of not less than fifty million dollars (**$50,000,000**) for damages resulting from defendant's, breach and non- performance of the verbal agreement with plaintiff;

b) A monetary amount of not less than ten million dollars (**$10,000,000**) for damages resulting from the severe anguish and mental suffering of plaintiff;

c) A monetary amount of not less than (**$40,000,000**) from defendants for their unjust enrichment, plus prejudgment and post judgment interest, costs of suit, attorneys' fees; and

d) all other relief this Honorable Court deems proper.

**RESPECTFULLY SUBMITTED**, in San Juan, Puerto Rico on December 31, 2023.

*s/Jane Becker Whitaker/*
**JANE BECKER WHITAKER**
U.S.D.C. No. 205110

PO Box 9023914
San Juan, PR 00902-3914
Tel. (787) 585-3824 / E-mail: janebeckerwhitaker@gmail.com

*s/Jean Paul Vissepó Garriga/*
**JEAN PAUL VISSEPÓ GARRIGA**
U.S.D.C. No. 221504

PO Box 367116
San Juan, PR 00936-7116
Tel. (787) 633-9601 / E-mail: jp@vissepolaw.com